## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

EDWARD A. CARNEY :
                                     :
         v.                             :            CCB-03-3493
                                       :
UNITED STATES OF AMERICA, :

...o0o...

### MEMORANDUM

Now pending in this admiralty case is the defendant's motion to dismiss the plaintiff's First Cause of Action for lack of subject matter jurisdiction, maintaining that the plaintiff's claims are subject to the discretionary function exception in the Suits in Admiralty Act. The United States also has moved for partial summary judgment on the Second Cause of Action on the ground that it does not presently owe any maintenance or cure. Oral argument was heard on April 8, 2005. A supplemental filing was permitted but not received. For the reasons stated below, the motions will be granted in part and denied in part.

### BACKGROUND

Edward A. Carney ("Carney") was employed as a First Assistant Engineer on the United States Naval Vessel YANO ("YANO") by Patriot Contract Services, LLC ("Patriot"), a private contractor that operates as an agent of the United States. (Mellusi Aff. as to Exhibits Annexed to Mem. of Law[1], Ex. 2, Martucci Dep. at 23-24.) The YANO, formerly known as the LEISE MAERSK, was built in Denmark in 1981 and lengthened in 1987. (Def.'s Mot. to Dismiss, Ex. 1, Dempster Aff at ¶ 4.) To meet the military's need for more ships to transport equipment and supplies,

---

[1]The Mellusi Affidavit as to Exhibits Annexed to Memorandum of Law will hereinafter be referred to as Mellusi Aff. I. The Mellusi Affidavit In Opposition to Motion for Summary Judgment on Maintenance & Cure will be called Mellusi Aff. II.

the Department of Defense selected several existing ships, including the LEISE MAERSK, to be

converted for military use.  (Id. at ¶ 3.)  In 1994, the conversion process began at the National Steel

and Shipbuilding Company ("the yard") in San Diego, California.  (Id. at ¶ 5.)  On February 8, 1997,

the ship was delivered to the Department of Defense's Military Sealift Command ("MSC") and was

dubbed the YANO.  (Id.)

As part of the conversion process, the yard installed a Marlo Coil Type STH Model 160M air

handling unit in space 05-188-1 to pre-cool the air sent to the YANO's air conditioning system and to

disperse fresh air to the galley.  (Id. at ¶ 8; Mellusi Aff. I, Ex. 2, Martucci Dep. at 37-39; id. at Exs. 4,

5, Photos of Air Handler Compartment with Manufacturer Name.)  The air handling unit is located in an

interior compartment of a larger room, referred to as the fan room.  (Mellusi Aff. I., Ex. 2, Martucci

Dep. at 37; id. at Ex.3, Photo of Inside of Fan Room.)  The fan, or air handling unit, consists of a metal

box approximately 14 feet long, 9 feet wide, and 5 feet high. (Def.'s Mot. to Dismiss at 5.)  Inside the

unit is a large fan driven by a belt and pulley attached to a motor.  (Mellusi Aff. I, Exs.12-15, Photos of

Belt and Pulley.)  The belt and pulley typically have a metal guard covering it.  (Mellusi Aff. I, Ex. 7,

Photo of Air Handler System.)  This system satisfied the requirements issued by the United States to

the yard in its Circular of Requirements for Conversion of Existing Ships to Strategic Sealift Ships.

(Def.'s Mot. to Dismiss, Ex. 2, U.S. Requirements.)  Section 7.5 of the requirements deals with the

heating, ventilation, and air conditioning specifications for the conversion.  (Id.)

Chief Engineer Louis Martucci ("Martucci") discovered a problem with the air handler after he

realized that places normally ventilated by the air handler were not getting adequate air.  (Mellusi Aff. I,

Ex. 2, Martucci Dep. at 64, 70.)  Martucci went to the fan room and found that the belts were torn and

the pulleys were flapping around.  (Id. at 72.)  Before he checked the fan, Martucci electrically shut off,

or locked out, power to the electric motor to prevent anyone from restarting the motor while he was

there.  (Id. at 75.)  Martucci noted, however, that the fan, belts and pulley were still rotating because

there was air coming through the intake openings causing the "freewheeling" of the fan.[2]  (Id. at 74-75.)

Thereafter, Martucci assigned the repair job to Carney, knowing that Carney would in turn

assign the mechanical work to one or two of the ship's QMEDs, or qualified engine mechanics.  (Id. at

77-78, 84-85.)  Prior to their repair work, Martucci shut down the electricity and closed one of the

vents to prevent the fan from freewheeling.  (Id. at 84-86.)  However, there were two other vents in the

compartment that were not closed.  (Id. at 86.)  When the QMEDs did get into the fan room, they

were able to temporarily fix the belts and pulley.  The repair work was only temporary as one pulley

was damaged too much to be fixed.[3]  (Id. at 87.)  Accordingly, Martucci decided to order a

replacement pulley.  (Id. at 92.)  Because Martucci could not find the manual with specifications that

would enable him to order the part from a parts list, he decided to measure the pulleys, motor shaft, and

fan shaft to get the exact dimensions.  (Id. at 62-63, 93.)  Martucci asked Carney to come with him to

---

[2]The manufacturer's warnings entitled "Safety Precautions for Marlo Fan Coil Assembly" do not warn or suggest that there is any potential danger of freewheeling or any other way for the fan to rotate without electrical power.  These instructions were written on a placard which is located next to the door to the air handler compartment.  (Mellusi Aff. I, Ex. 2, Martucci Dep. at 119-120; Def.'s Reply to Pl.'s Opp'n to Mot. to Dismiss, Ex. 1, Photo of Marlo Safety Precautions.)  While the placard addresses electrical lockout, it does not mention and Martucci did not know of any method for mechanical lockout of the fan.  (Mellusi Aff. I., Ex. 2, Martucci Dep. at 120-121.)

[3]Though Carney insists that the engineering crew was incompetent and required excessive amounts of time for training, apparently the mechanics were able to complete this task.  In general, however, Martucci agreed with Carney that the other three engineers were not up to par and that he and Carney worked overtime because of the others' deficiencies.  (Id. at 151-152, 155-156.)  Martucci stated that Carney complained of exhaustion.  (Id. at 152.)

help him take the measurements because Martucci had a hard time getting into the "tight spot."[4]  (Id. at 62.)

Once again, Martucci had the electrical motor locked out to make sure no one would restart it while he and Carney were measuring the air handler components.  (Id. at 115.[5])  Martucci also closed one vent but was not able to close all three vents as he could not get through the space to close two of them. (Id. at 83-84, 121.)  Martucci could not think of any other precaution short of tying the fan down with a rope to prevent it from freewheeling, which he did not do.  (Id. at 119.)  According to his recollection, he did not discuss the possibility of the fan freewheeling with Carney.  (Id. at 138.)

Late in the afternoon on May 15, 2003, Carney and Martucci went together to the fan room. (Id. at 122.)  Carney lost his balance while he was entering the air handler compartment to take the measurements and dictate them to Martucci, who was standing outside the compartment but in the fan room.  (Id. at 126.)  Carney fell forward and reached out, grabbing the belt which took his left hand up and twisted it as he fell.  (Id.)  The accident resulted in the partial amputation of a finger and other hand injuries that were treated immediately in Kuwait and again in California, where Carney had three surgical procedures done on his hand.  (Mellusi Aff. II at 1; Def.'s Reply to Pl.'s Opp'n to Mot. to Dismiss at 3 fn. 1.)

 In November 2003, Carney's hand surgeon, Dr. Michael Cardenas, referred him to Tower Orthopedics and Sports Medicine because Dr. Cardenas realized that Carney's left shoulder symptoms

---

[4]This was approximately one or two weeks after Martucci had discovered a problem with the air handler.

[5]Though this page is missing from the exhibit, it is quoted in the defendant's motion to dismiss at 13.

needed to be seen by a specialist.  (Mellusi Aff. II at 1-2.)  Carney was seen by Dr. Mehrdad

Ganjianpour on November 11, 2003, the same day that his attorney contacted Lisa Hernandez

("Hernandez"), the Claims Manager of Patriot Contract Services, LLC, to obtain approval for the

shoulder evaluation and related treatment.  (Id. at 2.)  Hernandez did not give approval at that time.  On

December 9, 2003, Carney's attorney sent Hernandez a letter confirming her position and enclosed a

copy of Dr. Ganjianpour's report which noted left shoulder and cervical injuries.  (Id. at Ex. 1,

December 9, 2003 Mellusi Letter.)  The doctor opined that the injuries resulted from the May 15th

accident.  (Id.[6])  Counsel advised Hernandez that Carney was in extreme pain and was undergoing

shoulder surgery the following week.  (Id. at 2.)  A plea was made for Patriot to accept responsibility.

(Id. at 2.)

Carney filed this action against the United States on December 9, 2003, the same day the letter

was written to Hernandez.  In it, Carney asserts two causes of action.  First, Carney alleges that his

injuries were due to the negligence of the defendant and its agents and that the vessel was unseaworthy.

Second, Carney alleges that he suffered from the defendant's failure to provide prompt and timely

"cure," or payment of his medical expenses.  In his complaint, Carney asks for judgment in the amount

of four million dollars and for attorneys' fees.

Carney's attorney was contacted by the defense counsel in this proceeding on March 1, 2004,

requesting that Carney submit to an independent medical examination of his neck and shoulder.[7]

---

[6]The Mellusi Aff. II states that Dr. Ganjianpour's report is enclosed in Exhibit 1.  However, it
appears to have been omitted from the record.

[7]After filing the complaint, Carney's counsel sent numerous letters to the union and Patriot to
request payment of medical expenses.  (Mellusi Aff. II, Ex. 4, January 8, 2004 Mellusi Letter.)

(Mellusi Aff. II, at Ex. 6[8], March 1, 2003 Diorio Letter.)  Carney agreed and, after waiting about two

months for an appointment to be scheduled, he was examined by Dr. Robert Riederman in Baltimore

on May 5, 2004.  (Id. at Ex. 10, April 12, 2004 Diorio e-mail.)  On June 21, 2004, and June 30,

2004, Carney's attorney sent letters to Patriot and the union asking for approval of treatment and

submitting bills, stating he had not heard from opposing counsel or Patriot as to a decision following the

examination.  (Id. at Exs. 11, 12, June 21st and June 30th Mellusi Letters.)  On July 7, 2004, Carney

was informed via counsel that Patriot would pay all outstanding invoices relating to the shoulder surgery.

(Id. at Ex. 13, July 7, 2004 Diorio Letter.)  However, Patriot sought more information as to the spine

surgery.  (Id.)  The claim for spine surgery was also accepted after several letters supporting it were

rejected[9].  (Mellusi Aff. II at 10.)

## ANALYSIS

### I. Motion to Dismiss for lack of subject matter jurisdiction: discretionary function exception

As sovereign, the United States cannot be sued unless it consents to be sued.  U.S. v.

Sherwood, 312 U.S. 584, 586 (1941).  Thus, subject matter jurisdiction in this case is limited to that

afforded by the Suits in Admiralty Act ("SAA"), 46 U.S.C. §§ 741-752, and the Public Vessels Act

("PVA"), 46 U.S.C. §§ 781-790.  That jurisdiction is based upon 28 U.S.C. §1331 under the "Jones

_____

(Though they are cited as exhibits 3 and 5, Mellusi's January 6, 2004 letter to Patriot and February 13, 2004 letters to the union and Patriot were not included in the record.)

[8]There are two exhibits in Mellusi Aff. II that are numbered six. This cite refers to the second of those two exhibits.

[9]Carney does not provide an exact date for the claim's acceptance.  He does mention that July 15th was the last date that Carney's doctors sent a letter of explanation to Hernandez about Carney's need for spine surgery.  (Mellusi Aff. II at 10.)

Act," 46 U.S.C. §688, and upon 28 U.S.C. §1333, admiralty and general maritime jurisdiction.

As of October 14, 2004, the Fourth Circuit aligned itself with the other Circuits that have concluded that the "government's waiver of sovereign immunity reflected in the Suits in Admiralty Act is subject to an implied exception similar to the discretionary function exception contained in" the Federal Tort Claims Act ("FTCA").  McMellon v. United States, 387 F.3d 329, 331 (4th Cir. 2003)(rehearing en banc)(overruling Lane v. United States, 529 F.2d 175, 179 (4th Cir. 1975)).  If the discretionary function exception limits the waiver and bars suit, the court lacks subject matter jurisdiction.  See Williams v. United States, 50 F.3d 299, 305 (4th Cir. 1995).    To determine whether an action or omission is a discretionary function, the two prong Berkovitz-Gaubert test applies.  See Smith v. United States, 251 F.Supp.2d 1255, 1259 (D. Md. 2003).  First, the exception only applies if the challenged government conduct involved an element of judgment or choice.  Id.  If a federal statute, regulation, or policy requires a government employee to follow a certain course of action, the discretionary function exception will not apply because nothing is left to the employee's will.  See Berkovitz v. United States, 486 U.S. 531, 536 (1988).  If the challenged conduct does involve judgment or choice, the court must next determine if the choice was based on considerations of social, economic, or political policy.  See Smith, 251 F.Supp.2d at 1259 (citing Baum v. United States, 986 F.2d 716, 720 (4th Cir. 1993)).  There is a presumption that if a government agent is expressly or impliedly authorized to exercise discretion by statute, regulation, or agency guidelines, that agent's acts are grounded in policy when employing that discretion.  U.S. v. Gaubert, 499 U.S. 315, 324 (1991).

In McMellon, the Fourth Circuit held that the application and scope of the discretionary function exception under the SAA should follow the development of that exception under the FTCA.

387 F.3d at 349.  Thus, as under the FTCA, Carney bears the initial burden of proving subject matter

jurisdiction and the United States bears the burden of proving the application of the discretionary

function exception.

      The United States argues that several allegations in the complaint relate to the design of the fan

room and the air handling unit.[10]  It maintains that the determination of how to design equipment is a

discretionary act not subject to judicial review.  See Boyle v. United Technologies Corp., 487 U.S.

500, 511 (1988)("We think that the selection of the appropriate design for military equipment to be

used by our Armed Forces is assuredly a discretionary function within the meaning of this provision.");

Baldassaro v. United States, 64 F.3d 206, 209 (5th Cir. 1995)("as the act of selecting or approving a

particular ship...involves an element of judgment or choice, that act, standing alone, satisfies the first

prong of the discretionary function exception standard."); Baum v. United States, 765 F.Supp. 268,

275 (D.Md. 1991), aff'd, 986 F.2d 716, 722 (4th Cir. 1993)(design of guardrails on a National Park

Service roadway was discretionary).

      Citing Baldassaro, the United States asserts that selecting a ship for public use is a discretionary

act as there is no specific statute, regulation, or policy that mandates how the government should

procure or convert a vessel for military use.  The National Defense Authorization Act for Fiscal Year

1993, Pub. Law No. 102-484, authorized the purchase of vessels for conversion.  (Def.'s Reply to

Pl.'s Opp'n, Ex. 2, DOD Authorization Act.) Nothing in the act, however, lists criteria for choosing

---

    [10]According to the United States, the failure to maintain and provide reasonably safe
equipment, the failure to correct dangerous and hazardous conditions and obstructions involving
machinery, and the failure to take adequate means or precautions for the safety of the plaintiff in failing
to provide him with a reasonably safe place to work are all "design-related claims."

ships for conversion.  The United States also argues that the design and acceptance of the air handling

unit were discretionary acts because, although the United States gave requirements to the yard as to the

heating, cooling, and air conditioning needs for the YANO in its Circular of Requirements for

Conversion of Existing Ships to Strategic Sealift Ships, no rules state how those requirements are to be

met.  This is sufficient to satisfy the first prong of the discretionary function test.

   The more difficult part of the discretionary function exception inquiry, ordinarily, is the second

prong: whether the judgment or decision was grounded in considerations of public policy.  In this case,

the National Defense Authorization Act supports the government's contention that the YANO was

purchased because the government concluded that more vessels were needed for strategic sealift

purposes in the wake of the first Gulf War.  The United States asserts that several factors must have

been implicated in making the decision to acquire the YANO and lists as examples military utility,

remaining useful life, seaworthiness and condition, budget constraints, value to the government, and

practicability of conversion.[11]  The government has thus established that the selection of the YANO for

conversion is within the discretionary function exception.

   As to design, Carney contends that the design defect in the fan room was the absence of a

hand-grab or hand-hold device to assist in stepping over the air handler, and poor lighting.  Carney

relies on Gotha v. United States, 115 F.3d 176 (3rd Cir. 1997) and Cestonaro v. U.S., 211 F.3d 749

(3rd Cir. 2000) to conclude that "garden-variety, housekeeping" decisions like these are not exempt

---

[11]Whether the government actor or decision-maker considered the policy factors is not
dispositive as long as the decision is subject to policy analysis. Gotha v. United States, 115 F.3d 176,
180 (3rd Cir. 1997)(quoting Smith v. Johns-Manville Corp., 795 F.2d 301, 308-09 (3d Cir. 1986)).

under the discretionary function exception.  Gotha, 115 F.3d at 181.  However, as the United States

points out, there is a distinction between the decision to install stairs on land in the place of an unpaved

path as in Gotha or the design of a parking lot as in Cestonaro and the design decisions involving a ship

that is used for military sealifts.  This court finds that any design defects in the fan room, even those

dealing with mundane matters like lighting and handholds, are subsumed under the discretionary function

exception because, exercising its discretion, the government accepted the entire ship as converted, with

any potential defects.[12]

Carney also, however, asserts a negligent failure to warn and a negligent creation of unsafe

working conditions in connection with the fan room repairs.  The United States contends that its alleged

failure to warn of unsafe conditions or equipment is covered under the discretionary function exception,

citing Williams, 50 F.3d at 300, and Ford v. American Motors Corp., 770 F.2d 465, 467-468 (5th

Cir. 1985). Those cases, however, are distinguishable.  In Williams, the claim against the United States

for its failure to warn of slippery and wet floors was negated by its discretionary decision to hire outside

contractors to clean and maintain the premises on its behalf.  Id. at 310.  In Ford, the court concluded

that the Postal Service's failure to warn of potential rollover problems with the surplus trucks it sold

was a discretionary act, as was the decision to sell the vehicles, and both were decided by a

government agency after conducting a study.  Id. at 467-468.

A review of government failure to warn cases indicates that courts have distinguished between

situations in which the failure to warn was part of an overall policy decision and those where no public

---

[12]As the court in Baldassaro aptly reasoned, any decision could be overanalyzed to the point
"that any relationship to policy would appear too attenuated."  Id., 64 F.3d at 211.

policy considerations would support a failure to warn.  See Kiehn v. United States, 984 F.2d 1100,

1103-1105 (10th Cir. 1993)(failure to post warning signs about dangers involved in scaling sandstone

cliffs was part of overall policy to minimize intrusion upon area's natural setting); Johnson v. United

States, Dep't of Interior, 949 F.2d 332, 338 (10th Cir. 1991)(failure to warn about dangers in climbing

mountains was part of policy that limited governmental regulation of climbing); Zumwalt v. United

States, 928 F.2d 951, 955 (10th Cir. 1991)(absence of warning signs was part of overall policy to

maintain a trail in its wilderness state) cf. Duke v. Department of Agriculture, 131 F.3d 1407, 1412

(10th Cir. 1997)(failure to warn of the danger of falling rocks in camping area did not implicate political,

social, or economic decision which discretionary function exception was meant to protect); Boyd v.

United States ex rel. U.S. Army, Corps of Eng'rs, 881 F.2d 895, 898 (10th Cir. 1989)(failure to warn

swimmers of dangerous conditions was not part of policy decision to leave the area unzoned and for

unrestricted uses).  The Ninth Circuit analogizes the latter category of government failure to warn cases

to the negligence of a private citizen.  Faber v. United States, 56 F. 3d 1122, 1124 (9th Cir.

1995)(failure of forest service to warn about diving accidents despite federal policy promulgated to

respond to such accidents); Summers v. United States, 905 F.2d 1212, 1216 (9th Cir. 1990)(failure of

park service to warn of danger of stepping on hot coals after fire rings were permitted on public beach).


        In this case Carney asserts that Martucci failed to warn him that the fan could freewheel and

failed to warn him that the protective cover was not in place.  Martucci's failure to warn is similar to the

latter category of cases where no policy reason is implicated.  Accordingly, Carney's complaints about

Martucci's negligent failure to warn are not protected by the discretionary function exception.

Carney's second non-design-related complaint is that the government had an inadequate or incompetent crew on the YANO. According to 46 C.F.R. §15.501(b), the manning requirements for a particular vessel are left to the discretion of the government, after considering all the applicable laws, regulations, and other factors. As per its certificate of inspection, the YANO had the requisite number of engineers on board on the day of the accident.[13] The decision as to which employees to hire to staff the vessel is also left to the government's discretion, subject only to the licensing requirements for each position. See 46 C.F.R. § 15.401. In any event, Carney must show that a negligent act of a crewmember had a causal connection with his injury. See In re National Shipping Co. of Saudi Arabia, 84 F.Supp.2d 716, 718 (E.D.Va. 2000). Though Carney states that the other engineers were incompetent, poorly trained, and dependent on his assistance, he does not demonstrate that any negligent act of these allegedly unqualified crewmembers caused his injuries.

Carney does adequately allege that his injuries were caused by Martucci's negligence. Citing the LMSR Safety and Quality Management System Manual, Carney contends that the Chief Engineer is responsible for the maintenance and repair of the vessel's machinery, enforcement of safe working practices by engineering personnel, and compliance with safety procedures. (Mellusi Aff. I., Ex. 17, Patriot Contract Services, LLC. Safety & Quality Management System Manual Index at 4.) Nevertheless, Martucci told his engineers not to replace the protective guard on the fan after they did

---

[13]Interestingly, the Hernandez Affidavit states that the YANO was required to have one Chief Engineer, one First Assistant Engineer, one Second Assistant Engineer, one other licensed engineer and four oilers. On that day, there were eleven members of the engine department on board– more than the requirement. Instead of a Second Assistant Engineer, there were two First Assistant Engineers and two Third Assistant Engineers. Presumably, the extra First Engineer was in place of the Second Assistant Engineer. (Def.'s Mot. to Dismiss, Ex. 3, Hernandez Aff. at ¶¶ 2, 4.)

repairs.  Martucci explains that he told them to leave the cover off the fan because he expected to take

measurements to order replacement parts. Martucci then waited one to two weeks to take the

measurements with Carney.[14]   His decision to leave the protective guard off the fan for that long

apparently violated the machinery safeguarding rules that were included in Patriot's manual entitled

"Shipboard Safety and Training."[15]  (Id., Ex. 19, Occupational Hazards-Safeguarding Manual Section.)

The manual states that the crew leader, or chief engineer, should train his employees to "[n]ever operate

a machine if a guard or safety device is missing, altered, or inoperative."  (Id. at 2.)  It also instructs

trained workers to "[r]eplace all guards before returning the machine to service."  (Id.)

In addition, Martucci did not close all three vents into the fan room, thereby enabling air to

enter the fan room despite his prior firsthand observation of the fan freewheeling.  Nor did Martucci tie

the fan with rope, a measure he admitted would have prevented freewheeling from occurring.  Carney

contends that both of these acts were negligent as Martucci should have known that the Patriot

---

[14]Carney contends that removing the protective guard is an easy task, requiring the removal of a
few bolts using ordinary hand tools.  Accordingly, he argues that Martucci's decision not to replace the
guard is illustrative of the "careless, nonchalant attitude" denounced in the Patriot "Shipboard Safety
and Training" manual.  (See Mellusi Aff. I., Ex. 19, Occupational Hazards-Safeguarding Manual
Section at 1.)

[15]Carney maintains that other regulations that applied to the YANO had similar guard
provisions.  (Pl.'s Opp'n to Mot. to Dismiss at 20.)  The United States argues that these laws explicitly
exclude public vessels like the YANO.  (Def.'s Reply to Pl.'s Opp'n at 6.)  Yet, the contract
specifically subjects the YANO to Coast Guard regulations and states that Patriot cannot avoid
compliance by claiming waiver on grounds of public vessel status or National Defense waiver.  (Mellusi
Aff. I, Ex. 18, LMSR Contract.)  In any event, it is sufficient for present purposes to note that Martucci
apparently violated Patriot's own manual on safety.

shipboard safety manual required him to put the machine in a "zero mechanical state."[16]  (Id. at 3.)

Martucci explains that he could not physically manage to close the two vents that remained open.[17]

Assuming this is accurate, Martucci nevertheless might be found negligent because he did not

warn Carney that the guard was off, two vents were open, and the fan had the potential to freewheel.

Further, the Patriot shipboard safety manual instructs that the "leader" should "be sure all workers

understand that *lockout* (or *lockoff*, or *power lockout*) means more than just switching off the

electricity."  (Mellusi Aff. I, Ex. 19, Occupational Hazards-Safeguarding Manual Section at 2.)[18]

Carney asserts that as part of this duty, Martucci should have posted the three-column chart required

by the shipboard safety manual.

The United States argues that it is not liable for any of Martucci's actions because it is

protected by the discretionary function exception.  Endorsing this kind of blanket protection, however,

would enable a ship's crew, owners, or operators to abandon their duties of care and engage in

---

[16]The manual explains that powered machines can move by electrical power and numerous other ways, including "compressed air."  It states that before doing maintenance or repair work, the machine should be shut off and air and other forces that might make the machine move should be removed.  The manual also calls for procedures for achieving a zero mechanical state to "be well-defined, specific, and **written**  A three -column format works well: sequence of operations, description of operation, and reasons for step.  Each machine should have such a chart.  Don't hide these procedures away in a purchasing or receiving department; keep them visible where those who need them can see them."  (Mellusi Aff. I., Ex. 19, Occupational Hazards-Safeguarding Manual Section at 3.)  Martucci did not write or post such a chart.

[17]To contest this assertion, Carney cites James Dolan, someone he refers to as "defendant's maritime expert," as saying that the three vents were "accessible with a minimum of effort" to a "person of normal dexterity."  (Pl.'s Opp'n to Def.'s Mot. to Dismiss at 15.)

[18]Though Martucci testified that he was not aware of these lockout procedures, Carney contends that he should have been.  (Mellusi Aff. I., Ex. 2, Martucci Dep. at 117.)

14

negligent conduct.  This was not the purpose of the discretionary function exception.

In addition, the United States asserts that Carney "had more knowledge of the fan unit's interior than the Chief Engineer" and was not in need of a warning.  (Def.'s Reply to Pl.'s Opp'n at 6.)  This argument is not persuasive on summary judgment; the government has not shown that Carney had actual or  implied knowledge of the fan's potential to freewheel, particularly considering the fact that Carney had been on the YANO for only a month prior to his accident.[19] (Mellusi Aff. I, Ex. 2, Martucci Dep. at 148.)

As the arguments for Carney's negligence and unseaworthiness claims overlap, there is no need for the court to address the unseaworthiness claim separately.

## II. Motion for Summary Judgment: Maintenance and Cure

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any, show that there is no genuine issue
> as to any material fact and that the moving party is entitled to a judgment as a matter of
> law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of some alleged factual
> dispute between the parties will not defeat an otherwise properly supported motion for
> summary judgment; the requirement is that there be no genuine issue of material fact.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there

---

[19]In contrast, Martucci had been Chief Engineer of the YANO for about two years.  (Mellusi Aff. I, Ex. 2, Martucci Dep. at 6.)

is a genuine issue for trial.'" <u>Bouchat v. Baltimore Ravens Football Club, Inc.</u>, 346 F.3d 514, 525 (4th

Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court must "view the evidence in

the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without

weighing the evidence or assessing the witness' credibility," <u>Dennis v. Columbia Colleton Med. Ctr.,</u>

<u>Inc.</u>, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation

of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."

<u>Bouchat</u>, 346 F.3d at 526 (internal quotation marks omitted) (quoting <u>Drewitt v. Pratt</u>, 999 F.2d 774,

778-79 (4th Cir. 1993), and citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986)).

Under maritime law, maintenance and cure is owed any seaman injured while in service of the

ship, without regard to fault, negligence, or causation.  <u>See</u> 1 Thomas Schoenbaum, <u>Admiralty and</u>

<u>Maritime Law</u>, § 6-28 (4th Ed. 2004).  Maintenance is defined as the right to food and lodging, while

cure is the right to necessary medical services.  <u>Id</u>.  Both of these rights exist until the seaman has

reached his/her "maximum recovery."  <u>Id</u>.  When a shipowner "unreasonably refuses to pay a

seaman's claim for maintenance and cure, the seaman may recover consequential damages, including

lost wages, pain and suffering, and attorney's fees and costs."  <u>Zuniga v. TMF, Inc</u>., 261 F.Supp.2d

518, 526 (E.D. Va. 2003)(citations omitted); 70 Am. Jur. 2d Shipping § 333 (2005).  The cause of

action for wrongful failure to pay maintenance and cure includes situations in which there has been an

improper delay of such payments.   <u>Deisler v. McCormack Aggregates</u>, 54 F.3d 1074, 1084-85 (3rd

Cir. 1995); <u>Sims v. U.S. War Shipping Admin</u>., 186 F.2d 972, 974-75 (3rd Cir. 1951).

The United States argues that it has paid Carney his outstanding wages, daily maintenance,

medical bills, and an additional $1, 608 per month (Def.'s Mot. to Dismiss at 24-15), which Carney

does not deny.  Carney asserts, however, that the United States did not timely and properly satisfy its obligation in regard to his neck and shoulder injuries and that because of this delay, he has sustained further harm.   As summarized above, the claims that Carney made on November 11, 2003 were not accepted until some time after July 15, 2004. (See Mellusi Aff. II at 1, 10.)  Accordingly, in his complaint, Carney seeks a consequential damage award for maintenance and cure and asks for attorneys' fees.

Carney cites no case that awards attorneys' fees in an action for maintenance and cure where the defendant was the United States.  In Kasprik v. United States, 87 F.3d 462 (11th Cir. 1996) the Eleventh Circuit explained that "attorneys' fees may not be awarded against the United States in the absence of a specific statutory authority...Our examination of the terms of the Suits in Admiralty Act reveal no explicit authorization for such an award."  Id. at 466, fn. 3.  Moreover, the United States argues that Carney is not entitled to attorneys' fees as the Fourth Circuit has held that a plaintiff cannot recover punitive damages from the United States.  See Manuel v. United States, 50 F.3d 1253, 1260 (4th Cir. 1995).  At oral argument, Carney's counsel did not press a claim for attorneys' fees or punitive damages, and the government's motion will be granted as to those items.  To the extent that the delay in his receipt of maintenance and cure exacerbated Carney's injury or extended his pain and suffering, however, Carney may seek an award of consequential, or compensatory, damages.  Kasprik, 87 F.3d at 466, fn. 3, Sims, 186 F.2d at 974.[20]

---

[20]See also Deisler v. McCormack Aggregates, Co., 54 F.3d 1074, 1083 (3rd Cir. 1995).

A separate order follows.


__May 2, 2005____                          _____/s/_____
Date                                       Catherine C. Blake
                                           United States District Judge